[Cite as *Williams v. Portage Country Club Co.*, 2017-Ohio-8986.]

| | | |
|---|---|---|
| STATE OF OHIO | )<br>)ss: | IN THE COURT OF APPEALS<br>NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

JAMES WILLIAMS, et al.

     Appellants

     v.

PORTAGE COUNTRY CLUB COMPANY

     Appellee

C.A. No.     28445

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CV 2015-07-3508

DECISION AND JOURNAL ENTRY

Dated: December 13, 2017

---

CALLAHAN, Judge.

{¶1}   James and Traci Williams appeal from the Summit County Common Pleas Court's grant of summary judgment to the Portage Country Club Company ("Portage Country Club"). This Court affirms.

I.

{¶2}   The Williamses lived at 169 Hollywood Avenue in Akron, Ohio from February 2006 until July 2013. On July 10, 2013, the greater Akron area was hit by a severe storm that caused flooding throughout the city. A portion of the Williamses' basement wall collapsed forcing them to vacate the home.

{¶3}   The backyard of 169 Hollywood abuts a golf course owned by Portage Country Club. The golf course has been at that location since 1906. Originally, it was a nine-hole course, but it was redesigned and expanded to an eighteen-hole course around 1918.

{¶4} In 1956, Portage Country Club granted the City of Akron an easement "to construct, maintain, repair, enlarge, and reconstruct a sewer or sewers for drainage and sewerage purposes." Around that time, residential developments were built to the northeast and the west of the golf course. The storm and sanitary sewers within the easement "follow[] the natural drainage route" from the Burning Tree development on the northeast to Hollywood Avenue on the west.

{¶5} The home at 169 Hollywood was built in 1957. It sits at a lower elevation than the golf course. The low point of the golf course, around the fifth tee and the fourth green, is adjacent to the backyards along Hollywood Avenue. The golf course, 169 Hollywood, and nearby homes "are located in a localized low area that is surrounded on all sides by higher elevations" making them "very susceptible to flooding."

{¶6} The golf course contains multiple "risers" and catch basins to handle storm water. One of the catch basins is located in the vicinity of the fifth tee and approximately ten feet from the backyard of 169 Hollywood. At some point, the golf course's drainage system was tapped into the City's storm sewer system.

{¶7} In 2015, the Williamses sued Portage Country Club, bringing a count for nuisance and a count for trespass. Portage Country Club moved for summary judgment. The Williamses opposed the motion and contended that Portage Country Club had unreasonably interfered with the flow of surface water by (1) tapping into the City's storm sewer without permission and (2) failing to maintain the catch basin located behind their property. After reviewing the evidentiary material submitted by each side, the trial court granted summary judgment to Portage Country Club.

{¶8} The Williamses appeal, raising two assignments of error.

II.

**<u>ASSIGNMENT OF ERROR NO. 1</u>**

THE TRIAL COURT ERRED IN GRANTING APPELLEE'S MOTION FOR SUMMARY JUDGMENT IN FINDING NO GENUINE ISSUES OF FACT AND ENTITLING APPELLEE [TO] SUMMARY JUDGMENT AS A MATTER OF LAW UNDER THE REASONABLE-USE RULE.

**{¶9}** In their first assignment of error, the Williamses argue that Portage Country Club unreasonably diverted surface water from its golf course and, thereby, caused flooding damage to their property.

**{¶10}** This Court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). Pursuant to Civ.R. 56(C), summary judgment is proper if:

> (1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.

*Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977).

**{¶11}** The party moving for summary judgment bears the initial burden of informing the trial court of the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996). Specifically, the moving party must support the motion by pointing to some evidence of the type listed in Civ.R. 56(C). *Id.* at 292-293. If the moving party satisfies this burden, then the non-moving party has the reciprocal burden to demonstrate a genuine issue for trial remains. *Id.* at 293. The non-moving party may not rest upon the mere allegations or denials in their pleadings, but must point to or submit evidence of the type specified in Civ.R. 56(C). *Id.* at 293; Civ.R. 56(E).

{¶12} Ohio courts apply a reasonable-use rule to surface water disputes. *McGlashan v. Spade Rockledge Terrace Condo Dev. Corp.*, 62 Ohio St.2d 55 (1980), syllabus.

> [A] possessor of land is not unqualifiedly privileged to deal with surface water as he pleases, nor absolutely prohibited from interfering with the natural flow of surface waters to the detriment of others. Each possessor is legally privileged to make a reasonable use of his land, even though the flow of surface waters is altered thereby and causes some harm to others, and the possessor incurs liability only when his harmful interference with the flow of surface water is unreasonable.

*Id.* "Under the reasonable use rule, * * * the defendant's liability for interference with surface water flow is controlled by principles of common-law negligence, regardless of whether the plaintiff's cause of action sounds in nuisance or trespass." *Horrisberger v. Mohlmaster*, 102 Ohio App.3d 494, 498 (9th Dist.1995). *See also Majesky v. Lawrence*, 9th Dist. Lorain No. 13CA010405, 2015-Ohio-49, ¶ 18.

{¶13} To establish a common-law negligence claim, "the plaintiff must show that the defendant owed a duty of care, that the defendant breached the duty of care, and that the defendant's breach of duty was the direct and proximate cause of the plaintiff's injuries." *Horrisberger* at 498. To survive summary judgment, the plaintiff must point to evidence in the record from which reasonable minds could find all of these elements. *Thewlis v. Munyon*, 9th Dist. Medina No. 2262-M, 1994 Ohio App. LEXIS 712, *5 (Feb. 16, 1994). If the plaintiff fails to do so "as to any one of the elements, the defendant is entitled to judgment as a matter of law." *Id.*

{¶14} "The mere fact that damage occurred [is] not, in and of itself, proof of negligence." *Ellery v. Ridge Club*, 1st Dist. Hamilton No. C-040189, 2005-Ohio-1873, ¶ 8. "[I]f the plaintiff's evidence on the issue of proximate cause is so meager and inconclusive that a

finding of proximate cause would rest solely on speculation and conjecture, the defendant is entitled to judgment as a matter of law." *Thewlis* at *12.

{¶15} By all accounts, the storm in July 2013 was severe and caused widespread flooding. Based on his review of newspaper articles and national weather service reports, Portage Country Club's expert characterized the storm as a "flash flood." The assistant superintendent for the golf course was deposed and stated that he encountered multiple roads that were closed due to water from the storm that day. Comparing two storms that he experienced while living at 169 Hollywood, Mr. Williams testified in his deposition that, "in a short window of time, 2013 had much more water than 2011." He further testified that, following the 2013 storm, "many people that [he] spoke with said that they had water in their basement[s]" and "[he]'d venture to say that half of Akron probably did."

{¶16} Nonetheless, the Williamses argue that Portage Country Club caused the flooding damage that they experienced by unreasonably diverting surface water from its course to 169 Hollywood. In particular, the Williamses claim that Portage Country Club's construction of its golf course and tapping into the City's storm sewer led to the flooding they experienced.

{¶17} Regarding construction, the Williamses argue that Portage Country Club "rebuilt" its golf course, first when it changed it from a nine-hole course to an eighteen-hole course, and again in 2014. The Williamses further contend that, by "rebuilding the golf course," Portage Country Club "necessarily changed the topography of the land which, in turn, changed the natural flow of surface water." The Williamses did not argue below that changes in the golf course's topography caused the flooding that they experienced in 2013. "Arguments that were not raised in the trial court cannot be raised for the first time on appeal." *JPMorgan Chase Bank,*

*Natl. Assn. v. Burden*, 9th Dist. Summit No. 27104, 2014-Ohio-2746, ¶ 12. Therefore, this Court will not address the Williamses' argument concerning the construction of the golf course.

{¶18} As to the tap in, the Williamses argue that Portage Country Club tapped into the City's storm sewer without permission[1], increasing the volume of water, which "necessarily overwhelmed" the system and, thereby, caused the flooding that they experienced. The trial court found that the Williamses failed to present any evidence demonstrating a change in flow before and after the tap in and, thus, had not established a causal link. This Court agrees.

{¶19} The Williamses assert, "The drainage built by Akron was 36 inches in diameter and was specifically designed for a 40.90-acre tract of land, the Burning Tree residential development." They further assert, "As a result of [Portage Country Club's] conduct, the 36-inch pipe has to service 152.05 acres, rather than the original 40.90 acres." The Williamses claim that their expert report supports these assertions. Their expert report, however, does not make any such statements.

{¶20} The Williamses' expert identified six factors that contributed to the flooding at 169 Hollywood.

1. The study area is situated in a localized low spot that is downstream from a 152.05 [a]cre drainage area that extends east to Portage Path.

2. The storm sewer that services the study area is located within an easement and is publically [sic] owned and operated.

3. The study area is solely reliant on a publically [sic] owned 36" [s]torm [s]ewer that runs along the north side of 169 Hollywood Avenue and connects to a 36"

---

[1] The parties did not present evidence regarding who tapped the golf course drainage system into the City's storm sewer. Arguably, the City could have tied the golf course's system in when the City installed its storm sewer in the easement. The result in this case, however, does not depend on whether Portage Country Club or the City was the entity that tapped the golf course's drainage system into the City's storm sewer system. For simplicity in addressing the argument, this Court's opinion is written consistent with the Williamses' argument that Portage Country Club performed the tap in.

[s]torm [s]ewer in the Hollywood Avenue right-of-way. Anything that hinders the operation of this system (inlet blocked, breakage, pipe blocked) will have immediate negative impacts.

4. Drainage [a]rea analysis and storm sewer calculations show that the existing publically [sic] owned 36" [s]torm [s]ewer pipe is undersized and begins to surcharge during a 10-year event, with water levels two (2) feet above the rim of the catch basin behind 169 Hollywood Ave[nue] during a 25-year event.

5. During surface flooding events, floodwaters must wait to pass through the undersized 36" storm sewer and cannot exit the area via surface flow (because of the localized low spot).

6. 169 Hollywood Ave[nue] is immediately adjacent to the low point of the golf course, which is the location where all piped and overland flow concentrates during flooding events.

Notably absent from this list is any reference to Portage Country Club tapping into the City's storm sewer.

{¶21} The Williamses argue that their expert "accounted for [Portage Country Club] tapping into the 36-inch pipe, in that he considered water run-off from the entire 152.05 acres, the combined [] acreage of [the] Burning Tree [development] and [Portage Country Club]'s golf course." It is true that their expert defined the "drainage area [as] comprised of two major components:" a 40.90-acre residential development and a 111.15-acre golf course for a total drainage area of 152.05 acres. He did not state, however, whether the storm sewer was originally designed for a 40.90-acre tract or the entire 152.05 acres. Further, he did not opine that Portage Country Club tapping into the system caused any change.

{¶22} The Williamses contend that the experts found the storm sewer system "undersized" because it services 152.05 acres. This is not what either expert stated. The Williamses' expert stated that "[s]torm sewer systems are typically designed to operate without surcharge for all events up to and including the 10-year storm event." He concluded that, because the system surcharges during a 10-year event, it is "undersized and does not meet

current design standards." The Williamses' expert did not state that the system was undersized based on the design standards in place when it was originally installed or what acreage it was originally designed to service.

{¶23} Portage Country Club's expert stated, "About 1957, storm sewers of this type were usually designed for two or five year return period storms in accordance with the engineering standard of the day." By contrast, current design standards are for ten to twenty-five year storms. He concluded that the flooding in 2013 "exceeded the twenty-five year storm event. In other words, the actual flooding was so severe that it would have exceeded the capacity of a drainage system designed to the current engineering standards."

{¶24} Construing the evidence in the Williamses' favor, the expert reports indicated that the storm sewer system is undersized by current design standards. The Williamses have not, however, pointed to any evidence in the record indicating that Portage Country Club tapping into the City's storm sewer system changed the system as originally designed or caused increased flooding on their property. Consequently, the Williamses failed to establish that a genuine issue of material fact remained for trial.

{¶25} The first assignment of error is overruled.

### ASSIGNMENT OF ERROR NO. 2

THE TRIAL COURT ERRED IN GRANTING APPELLEE'S MOTION FOR SUMMARY JUDGMENT IN FINDING NO GENUINE ISSUES OF FACT AND ENTITLING APPELLEE [TO] SUMMARY JUDGMENT AS A MATTER OF LAW REGARDING NEGLIGEN[T] MAINTENANCE OF [THE] SEWER CATCH BASIN.

{¶26} In their second assignment of error, the Williamses argue that Portage Country Club had a duty to maintain the catch basin located near the fifth tee, it breached that duty by

failing to keep the catch basin free from debris, and that breach caused the flood to spread to their residence.

{¶27} The Williamses essentially contend that they established the elements of a negligence claim regarding the maintenance of the catch basin. As previously noted, to survive a summary judgment motion, the plaintiff must point to evidence in the record bearing on each of the elements of its claim. *See Thewlis*, 1994 Ohio App. LEXIS 712, at \*5. The trial court found that, even if Portage Country Club had a duty, the Williamses failed to present evidence demonstrating a genuine issue on the breach or causation prongs. Having reviewed the record, this Court agrees.

{¶28} In their depositions, the general manager, the superintendent, and the assistant superintendent of the golf course all testified that the catch basin had been there as long as they worked at Portage Country Club, they did not know who owned it, but Portage Country Club maintained it. The general manager testified that a crew went by the catch basin every morning and cleared any debris from the grates. The superintendent explained that, even if Portage Country Club did not own the catch basin, he was "concern[ed] about it backing up on the golf course." Therefore, Portage Country Club's employees made sure it was clear of debris.

{¶29} During depositions, the Williamses presented pictures of the catch basin taken after the 2013 flood. Those picture show the catch basin covered with sticks, grass, leaves, and mud. Mr. Williams testified that he used a "spud bar" to clear the catch basin in 2011 after water flooded their basement. In addition, Ms. Williams testified that "periodically from [20]11 to 2013 [the Williamses] would clear stuff" from the catch basin. Aside from the time in 2011, she did not indicate whether this occurred before or after a rain event.

{¶30} The golf course superintendent and the assistant superintendent observed the catch basin following the 2013 flooding event and found it in the condition depicted in the pictures. They testified, however, that they had "never" seen the catch basin in that condition on a dry day. The superintendent elaborated that "flood waters would carry debris with the water" and "[w]hen the water recedes, then [one] can see the aftermath." The assistant superintendent testified that he goes by the catch basin daily, and the superintendent testified that he went by it a couple times a week.

{¶31} Portage Country Club's expert examined the catch basin and found it "appear[ed] to be maintained adequately." He stated that "[d]uring and after rains, floatable debris may accumulate." He opined that clearing the debris from the opening "is an adequate maintenance practice."

{¶32} The Williamses' expert opined that a number of items, including an "inlet [being] blocked," would have a "negative impact[]." He did not, however, opine that the catch basin was blocked prior to the 2013 flooding event, nor did he opine that it was inadequately maintained.

{¶33} The Williamses make the conclusory assertion that "because there was a flood, the catch basin must have been clogged." They do not, however, point to any evidence in the record to support this assertion. *See* App.R. 16(A)(7). "The mere fact that damage occurred [is] not, in and of itself, proof of negligence." *Ellery*, 2005-Ohio-1873, at ¶ 8. Moreover, the fact that something could be a cause does not establish that it actually was the cause in a given instance. *See Schafer v. Milovancev*, 9th Dist. Summit No. 19055, 1999 Ohio App. LEXIS 243, *3-4 (Feb. 3, 1999) (although gutters "could" overflow and result in ice on a porch, that does not mean they "actually" did so).

**{¶34}** Construing the evidence presented most strongly in favor of the Williamses, one could conclude that the catch basin was clogged *following* a flooding event in 2011 and again *following* a flooding event in 2013. But, as noted by the trial court, the Williamses presented "no evidence" regarding "the state of the [c]atch [b]asin near in time or immediately prior to the July 10, 2013 storm." Having failed to present any evidence that the catch basin was clogged *before* the flooding, the Williamses have not demonstrated a genuine issue of material fact remained regarding the maintenance of the catch basin.

**{¶35}** The second assignment of error is overruled.

### III.

**{¶36}** The Williamses' assignments of error are overruled. The judgment of the Summit County Common Pleas Court is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellants.

LYNNE S. CALLAHAN
FOR THE COURT

HENSAL, P. J.
TEODOSIO, J.
CONCUR.

APPEARANCES:

ROBERT C. MEEKER and BLAISE MEEKER, Attorneys at Law, for Appellants.

JOHN T. MURPHY and COLLEEN A. MOUNTCASTLE, Attorneys at Law, for Appellee.